## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **CHRISTOPHER ANDREW DALY III**, **MATTHEW BENJAMIN ROSS, CURTIS SMITH**, and **EMMA DONALD**, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>**ORACLE CORPORATION, CSC GLOBAL ENTERPRISES, LLC**, **TRUSTEES OF DARTMOUTH COLLEGE**, and **MASTEC, INC.**<br><br>      Defendants. | Case No. 1:25-cv-2039<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Christopher Andrew Daly III, Matthew Benjamin Ross, Curtis Smith, and Emma Donald ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Oracle Corporation ("Oracle"), CSC Global Enterprises, LLC ("CSC"), Trustees of Dartmouth College ("Dartmouth"), and MasTec, Inc. ("MasTec") (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.   This class action arises from Defendants' failure to protect highly sensitive data.

2.   Defendant Oracle processed data on behalf of Defendants CSC, Dartmouth and MasTec.

3.      Defendant Oracle is a multinational technology and enterprise software firm.[1]

4.      Oracle performs "sub processing" services for Defendants. A subprocessor is any third-party vendor or service provider that an organization hires to perform certain tasks or services on the organization's behalf. Here, Defendants CSC, Dartmouth and MasTec utilize Oracle's eBusiness Suite ("EBS") software to perform operations involving the PII in their possession.

5.      Thus, Defendant Oracle is a client of Defendants CSC, Dartmouth and MasTec.

6.      Accordingly, on information and belief, Oracle stores a litany of the highly sensitive personal identifiable information ("PII") about CSC's and MasTec's current and former employees, and Dartmouth's current and former students, including their names, Social Security numbers, driver's license or passport numbers, and financial information.

7.      However, this PII was inadequately protected and thus exposed to cybercriminals in a data breach (the "Data Breach"). On information and belief, the Data Breach has impacted several thousands of individuals.

8.      The notorious "CLOP" ransomware gang posted about the Data Breach on its dark web portal, indicating its intent to post and/or sell the sensitive PII it stole from Defendants on the dark web.[2]

9.      Upon information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity, CSC, Dartmouth, and MasTec failed to adequately monitor Oracle in handling and securing the PII of Plaintiffs, and Defendants failed to maintain reasonable security safeguards or protocols to protect Plaintiffs' and the Class's PII—rendering it an easy target for cybercriminals.

---

[1] *About Oracle*, ORACLE, https://www.oracle.com/corporate/ (last visited Dec. 10, 2025).
[2] FalconFeeds.io (@FalconFeeds.io), X (Oct. 22 2025, 7:15 PM), https://x.com/FalconFeedsio/status/1981152317559951781.

10.    Defendants' failure to report or failure to timely report the Data Breach made breach victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

11.    Defendants knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

12.    In failing to adequately protect the PII in its care, and by failing to adequately notify victims about the breach, Defendants violated state law and harmed an unknown number of CSC's and MasTec's current and former employees, and Dartmouth's current and former students.

13.    Plaintiffs and the Class are victims of Defendants' negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendants with their PII. But Defendants betrayed that trust. Defendants failed to properly use up-to-date security practices to prevent the Data Breach.

14.    Plaintiffs are Data Breach victims.

15.    The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

16.    Plaintiff, Christopher Andrew Daly III, is a natural person and a citizen of Pennsylvania, where he intends to remain. Plaintiff Daly is a former employee of CSC.

17.    Plaintiff, Matthew Benjamin Ross, is a natural person and a citizen of Massachusetts, where he intends to remain. Plaintiff Ross is a former student of Dartmouth.

18.     Plaintiff, Curtis Smith, is a natural person and a citizen of Florida, where he intends to remain. Plaintiff Smith is a former employee of MasTec.

19.     Plaintiff, Emma Donald, is a natural person and a citizen of Texas, where she intends to remain. Plaintiff Donald is a former employee of MasTec.

20.     Defendant, CSC Global Enterprises, LLC, is a Delaware corporation with its principal place of business at 251 Little Falls Dr., Wilmington, Delaware 19808.

21.     Defendant, Board of Trustees of Dartmouth College, is a private educational institution with its principal address at 6001 Parkhurst Hall, Suite 209, Hanover, New Hampshire 03755.

22.     Defendant, MasTec Inc., is a Florida profit corporation with its principal place of business at 800 S. Douglas Rd., Suite 1200, Coral Gables, Florida 33134.

23.     Defendant, Oracle Corporation, is a stock corporation incorporated in Delaware and with its principal place of business at 2300 Oracle Way, Austin, Texas 78741.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendants are citizens of different states. And there are over 100 putative Class Members.

25.     This Court has personal jurisdiction over Defendants because Defendant Oracle is headquartered in Texas and all Defendants regularly conduct business in Texas and have sufficient minimum contacts in Texas.

26.     Venue is proper in this Court because Defendant Oracle's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

***Defendants Collected and Stored the PII of Plaintiffs and the Class***

*Oracle*

27.     Defendant Oracle is a multinational technology and enterprise software firm that, *inter alia*, provides cloud infrastructure and applications that contain its clients' employees' and students' PII.[3]

28.     In collecting and maintaining the PII, Oracle agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

29.     Under state and federal law, businesses like Oracle have duties to protect the PII in its care.

30.     Oracle recognizes these duties, advertising in its "Privacy Policies" that:

a.     "Oracle has implemented and will maintain technical and organizational measures designed to prevent accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Services Personal Information. These measures, which are generally aligned with the ISO/IEC 27001:2013 standard, govern all areas of security applicable to the Services,

---

[3] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Dec. 10, 2025).

including physical access, system access, data access, transmission, input, security oversight, and enforcement."[4]

b.      "Oracle employees are required to maintain the confidentiality of personal information. Employees' obligations include written confidentiality agreements, regular training on information protection, and compliance with company policies concerning protection of confidential information."[5]

c.      "We do not share or sell personal information subject to this Privacy Policy with third parties for any commercial purposes."[6]

d.      "If personal information is transferred to an Oracle recipient in a country that does not provide an adequate level of protection for personal information under applicable data protection law in the country where such information was collected, Oracle will take adequate measures designed to protect the personal information, such as ensuring that such transfers are subject to EU Model Clauses or other adequate transfer mechanism as required under relevant data protection laws."[7]

31.    Despite recognizing its duty to do so, on information and belief, Oracle has not implemented reasonably cybersecurity safeguards or policies to protect the PII in its possession or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Oracle leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to the PII on its networks.

---

[4] *Privacy Policies*, ORACLE, https://www.oracle.com/legal/privacy/customer-data-research-development-privacy-policy/#9 (last visited Dec. 10, 2025).
[5] *Id*.
[6] *Id*.
[7] *Id*.

*Oracle and CSC*

32.    Defendant CSC is a multinational firm that describes itself as "the world's leading provider of global business administration and compliance solutions."[8] CSC provides services such as domain name management, cyber security services, matter and deal management, compliance and governance, and transaction services.[9]

33.    Oracle is a subprocessor for CSC. Specifically, Oracle performs "[c]loud-based financial management services, internal human resource services and US based (TBS /TCI) client tax filing support services" on behalf of CSC.[10] Additionally. Oracle performs "internal human resources services and US based (TBS /TCI) client tax filing support services."[11]

34.    Thus, as part of its business, Oracle receives and maintains the PII of thousands of CSC's current and former employees. On information and belief, such PII includes CSC's current and former employees' names, addresses, dates of birth, Social Security numbers, driver's license numbers, passport numbers, and financial information.

35.    CSC utilizes its employees' PII to facilitate its business operations.

36.    In collecting and maintaining PII, CSC agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

37.    CSC recognizes these duties, advertising in its "Global Privacy Notice" that:

---

[8] *CSC*, LINKEDIN, https://www.linkedin.com/company/cscsince1899/about/ (last visited Dec. 10, 2025).
[9] *Id.*
[10] *See CSC Sub Processors*, CSC, https://www.cscglobal.com/cscglobal/pdfs/CSC-Sub-processors-List.pdf (last visited Dec. 10, 2025).
[11] *Id.*

    a.    "We are committed to protecting and respecting your privacy and handling your information in an open and transparent manner;"

    b.    "The security of your personal data is important to us. We use generally accepted, industry standard tools and techniques to protect your personal data against unauthorized disclosure;"

    c.    "When using third-party vendors or agents to which CSC intends to transfer personal data, CSC shall perform adequate due diligence to help ensure the security of such information, including ensuring that such third party has entered into a written agreement with CSC requiring the third party to provide at least the same level of privacy protection as is required by the Data Protection Legislation."[12]

38.    Despite recognizing its duty to do so, on information and belief, CSC has not implemented reasonably cybersecurity safeguards or policies to protect employees' PII or adequately supervised its agent and vendor, Oracle. As a result, CSC leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

*Oracle and Dartmouth*

39.    Defendant Dartmouth is a private institution of higher learning offering degrees in a variety of disciplines.[13]

---

[12] *Privacy and Cookies*, CSC, https://www.cscglobal.com/service/privacy/ (last visited Dec. 10, 2025).
[13] *See Home Page*, DARTMOUTH, https://home.dartmouth.edu/ (last visited Dec. 10, 2025).

40.     According to a letter Dartmouth sent to the New Hampshire Attorney General about the Data Breach ("Breach Notice"), Dartmouth is a client of Oracle and uses Oracle's EBS software to help manage its operations.[14]

41.     To facilitate its operations, Dartmouth receives and maintains the PII of thousands of its current and former students.

42.     In collecting and maintaining the PII, Dartmouth agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

43.     Indeed, Dartmouth's Privacy Policy states:

a.      "Dartmouth College respects your privacy. Any information you provide on this website in the form of email, feedback forms, survey answers, or personal data will be used only by Dartmouth College in accordance with the terms of this Privacy Policy;"

b.      "Except as set out in this Privacy Policy, Dartmouth College will never share personally identifiable information about you..;"

c.      "Our contractors or service providers sometimes have *limited access* to the information you provide to us..;"

d.      "Dartmouth College maintains appropriate technical and organizational security measures to safeguard information submitted through this website."[15]

---

[14] Dartmouth's Breach Notice is attached hero as **Exhibit A.**
[15] *Privacy Policy for Dartmouth Websites*, DARTMOUTH, https://policies.dartmouth.edu/policy/privacy-policy-dartmouth-websites (last visited Dec. 10, 2025) (emphasis added).

44.     Further, Dartmouth's "Information Technology Policy" states:

a.      "Members of the Dartmouth community have reasonable expectations of privacy in their use of information resources;"

b.      "Information stored on an individual's account is presumed to be private unless the account holder has made the information available to others."[16]

45.     Despite its statement that third-party vendors "sometimes" have "limited access" to its students' PII, Oracle possessed at least Dartmouth's students' names, Social Security numbers and financial information.

46.     Despite recognizing its duty to do so, on information and belief, Dartmouth has not implemented reasonably cybersecurity safeguards or policies to protect students' PII or adequately supervised its agent and vendor, Oracle. As a result, Dartmouth leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to students' PII.

*Oracle and MasTec*

47.     Defendant MasTec is a construction firm involved in infrastructure projects across the country.[17]

48.     Oracle is a subprocessor for MasTec. Specifically, MasTec used Oracle EBS to gain "complete visibility" of its employees' demographics and to provide "deep" analysis of its employees' PII.[18]

---

[16] *Dartmouth Information Technology Policy*, DARTMOUTH, https://policies.dartmouth.edu/policy/dartmouth-information-technology-policy (last visited Dec. 10, 2025).
[17] *See Who We Are*, MASTEC, https://www.mastec.com/about/ (last visited Dec. 10, 2025).
[18] *See Experience / Case Studies*, KPI PARTNERS, https://www.kpipartners.com/experience/case-studies/mastec-kpi-cloud-analytics-for-hr (last visited Dec. 10, 2025).

49.     Thus, as part of its business, Oracle receives and maintains the PII of thousands of MasTec's current and former employees. On information and belief, such PII includes MasTec's current and former employees' names, addresses, dates of birth, Social Security numbers, driver's license numbers, passport numbers, and financial information.

50.     MasTec utilizes its employees' PII to facilitate its business operations.

51.     In collecting and maintaining the PII, MasTec agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

52.     MasTec recognizes these duties, advertising in its "Privacy Notice" that:

a.     "The privacy of our visitors is extremely importance to us;" and

b.     "We do not sell or otherwise share personal information with third parties for their direct marketing purposes.."[19]

53.     Despite recognizing its duty to do so, on information and belief, MasTec has not implemented reasonably cybersecurity safeguards or policies to protect employees' PII or adequately supervised its agent and vendor, Oracle. As a result, MasTec leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

***Defendants' Data Breach***

54.     Beginning as early as July 10, 2025, and continuing through an unknown time, Oracle was hacked by CLOP in the Data Breach—which compromised the data of its EBS customers (including CSC, Dartmouth and MasTec).[20]

---

[19] *Privacy*, MASTEC, https://www.mastec.com/privacy/ (last visited Dec. 10, 2025).

[20] *See* Peter Ukhanov *et al.*, *Oracle E-Business Suite Zero-Day Exploited in Widespread Extortion Campaign*, GOOGLE CLOUD BLOG (Oct. 9, 2025), https://cloud.google.com/blog/topics/threat-intelligence/oracle-ebusiness-suite-zero-day-exploitation.

55.    According to Z2Data, a risk intelligence firm, CLOP exploited a vulnerability in Oracle's EBS, leading to critical data breaches for dozens of large corporations.[21]

56.    CLOP was able to infiltrate Oracle's network by exploiting a "zero day vulnerability," or a security gap in a piece of software, hardware, or firmware that's unknown to its developers, and therefore susceptible to exploitation by cybercriminals and other malicious actors.[22] This allowed CLOP to tap into the vulnerability in order to steal and exfiltrate sensitive data.[23]

57.    According to the United States Cybersecurity & Infrastructure Security Agency ("CISA") CLOP carried out a similar attack in January of 2023, when, using a zero-day vulnerability, it targeted the GoAnywhere MFT platform and exfiltrated data from approximately 130 victims over the course of 10 days.[24] Over the next several weeks, as the exfiltrated data was parsed by the group, ransom notes were sent to the affected companies.[25] The ransom notes threatened to publish the stolen files on the CL0P data leak site if victims did not pay the ransom amount.[26]

---

[21] Michael Mariani, *Everything You Need to Know About the Oracle Data Breach*, Z2DATA (Nov. 25, 2025), https://www.z2data.com/insights/everything-you-need-to-know-about-the-oracle-data-breach.
[22] *Id.*
[23] *Id.*
[24] *#StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, CISA (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.
[25] *Id.*
[26] *Id.*

58.     The same thing has occurred here: due to Defendants' inadequate cybersecurity measures, CLOP exploited a critical Oracle EBS flaw and stole private information from a large number of organizations worldwide, including CSC, Dartmouth, and MasTec.[27]

59.     CLOP operates a "data leak site" or a portal hosted on the dark web where it publicly discloses stolen data as part of its ransomware attack strategy.[28]

60.     After this Data Breach, CLOP sent email communicates to Defendants' CEOs demanding payments.[29]  Researchers have confirmed that the specific contact addresses that sent these emails are publicly listed on the CLOP data leak site.[30]

61.     According to researchers at Google, CLOP's email to Defendants stated, *inter alia*:

   a.     "We have recently breached your Oracle E-Business Suite Application and copied a lot of documents. All the private files and other information are now held on our systems;"

   b.     "time is ticking on clock [sic] and in a few days if no payment we publish and close chat;"

   c.     "Decide soon and recall that no response result [sic] in blog posting. Name first soon after data."[31]

---

[27] *See* Bill Toulas, *Barts Health NHS discloses data breach after Oracle zero-day hack*, BLEEPING COMPUTER (Dec. 5, 2025), https://www.bleepingcomputer.com/news/security/barts-health-nhs-discloses-data-breach-after-oracle-zero-day-hack/.

[28] *See Oracle E-Business Suite Zero-Day Exploited in Widespread Extortion Campaign*, note 20, *supra*.

[29] David Jones, *Hackers claiming ties to Clop launch wide extortion campaign targeting corporate executives*, CYBERSECURITY DIVE (Oct. 2, 2025), https://www.cybersecuritydive.com/news/hackers-clop-extortion-campaign-executives/801808/.

[30] *Id.*

[31] *Id.*

62.    Because the deadline of a "few days" has long passed, on information and belief, Plaintiffs' and the Class's PII has already been published on the dark web.

*Clop and CSC*

63.    On October 23, 2025, CLOP created a post on its dark web data leak site naming CSC.[32]



64.     CLOP's post lists CSC's address, phone number, and website, and states "[t]he company doesn't care about its customers. It ignored their security!"[33]

65.     This indicates that CLOP has already published, or will imminently publish, the PII it stole from CSC in the Data Breach on the dark web.

66.     On information and belief, thousands of CSC's current and former employees' PII has been stolen by CLOP in the Data Breach.

67.     On information and belief, CSC has not informed breach victims that their PII has been stolen by a cybercriminal group or has been published on the dark web.

68.     On information and belief, Defendant CSC has made no public statements regarding CLOP or whether it paid a ransom demand.

*Clop and Dartmouth*

69.     According to Dartmouth's Breach Notice, "the Oracle EBS software experienced a "zero-day" vulnerability that allowed an unauthorized actor to take data from many of Oracle's EBS customers' environments, including Dartmouth's"[34]

70.     Dartmouth then launched an investigation, which revealed that "an unauthorized actor took certain files between August 9, 2025 and August 12, 2025.[35] Dartmouth reported to multiple state Attorney's General, including those of Maine, New Hampshire and Texas, that the

---

[33] *Id.*
[34] Ex. A.
[35] *Id.*

files stolen in the Data Breach included its current and former students' names, Social Security numbers, and financial information.[36, 37, 38]

71.    And yet, Dartmouth waited until November 24, 2025, before it began notifying the Class—over three months after the Data Breach occurred.[39]

72.    Thus, Dartmouth kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

73.    And when Dartmouth did notify the Class of the Data Breach, Dartmouth acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning the Class to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity over the next 12 to 24 months."[40]

74.    Dartmouth sent a different version of the Breach Notice to Plaintiff Ross, which is attached hereto as **Exhibit B**.

75.    The Breach Notice sent to Plaintiff Ross makes no mention of an "unauthorized actor" stealing files.[41] Instead, it merely states "Dartmouth is committed to protecting the privacy and security of information we maintain on members of our community. We are writing to inform

---

[36] *Id.*

[37] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ce67c791-f72f-415a-91fa-b7ba563ca747.html (last visited Dec. 10, 2025).

[38] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Dec. 10, 2025).

[39] Ex. A

[40] *Id.*

[41] Ex. B.

you of a data security incident that involved your information including your name, Social Security number, and financial account information."[42]

76.    Thus, Dartmouth sent at least some members of the Class a Breach Notice that downplayed the severity of the Data Breach and the harm it caused, refusing to inform victims how the breach happened, or that their data was stolen and exfiltrated by an "authorized actor."

77.    Neither the Breach Notice Dartmouth sent to the New Hampshire Attorney General or Plaintiff Ross informed victims that their PII had been stolen by CLOP and was posted on the dark web.

78.    Since the Data Breach, Dartmouth claims that it "implemented all publicly available patches provided following the incident for the Oracle EBS software and will continue to vet our vendors' data security practices."[43]

79.    But such simple declarations are insufficient to ensure that Plaintiff Ross's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

80.    Dartmouth has done little to remedy its Data Breach. True, Dartmouth has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff Ross and Class Members for the injuries that Dartmouth inflicted upon them.

81.    Additionally, on November 12, 2025, CLOP created a post on its dark web data leak site naming Dartmouth.[44]

---

[42] *Id.*
[43] Ex. A.
[44] FalconFeeds.io (@FalconFeeds.io), X (Nov. 11, 2025, 2:17 PM), https://x.com/FalconFeedsio/status/1988340376558817765.

**Headquarters:**

Parkhurst Hall 207, Hanover, New Hampshire, 03755, United States

**Phone:**

(603) 646-1110

**Website:**

www.dartmouth.edu

**Revenue:**

$367.8 Million

**Industry:**

Colleges & Universities, Education

**Warning:**

> The company doesn't care about its customers, it ignored their security!!!

**TORRENT MAGNET LINK :**

> [ magnet:?xt=urn:btih:e14eff579a4b97b7b559c543694bff6751aa77a0&dn=dartmouth.edu ]

82.    CLOP's post lists Dartmouth's address, phone number, and website, and states "[t]he company doesn't care about its customers. It ignored their security!!!"[45]

83.    Additionally, the post contains a clickable "Torrent Magnet Link," indicating that CLOP has made available PII it stole from Dartmouth in the Data Breach to anyone on the dark web who wishes to download it.

84.    Based on Dartmouth's letters to multiple state Attorneys General, the Data Breach has impacted 44,000 of Dartmouth's current and former students.[46]

---

[45] *Id.*

[46] Lars Daniel, *Dartmouth Data Breach Exposes 40,000 Social Security Numbers In Cl0p's Oracle Rampage*, FORBES (Dec. 7, 2025),

85.     On information and belief, Dartmouth has made no public statements regarding CLOP or whether it paid a ransom demand.

*Clop and MasTec*

86.     On October 28, 2025, CLOP created a post on its dark web data leak site naming MasTec.[47]



87.     CLOP's post lists MasTec's website, and states "[t]he company doesn't care about its customers. It ignored their security!!!"[48]

88.     This indicates that CLOP has already published, or will imminently publish, the PII it stole from MasTec in the Data Breach on the dark web.

89.     On information and belief, thousands of MasTec's current and former employees' PII has been stolen by CLOP in the Data Breach.

---

https://www.forbes.com/sites/larsdaniel/2025/12/07/dartmouth-data-breach-exposes-40000-social-security-numbers-in-cl0ps-oracle-rampage/.
[47] Clop, RANSOMLOOK, https://www.ransomlook.io/group/clop (last visited Dec. 10, 2025).
[48] *Id.*

90.     On information and belief, MasTec has not informed breach victims that their PII has been stolen by a cybercriminal group or has been published on the dark web.

91.     On information and belief, Defendant MasTec has made no public statements regarding CLOP or whether it paid a ransom demand.

*Allegations Common to all Defendants*

92.     Even if Defendants paid a ransom demand, this would not ensure the security of Plaintiffs' and the Class's PII. While ransomware groups usually remove stolen data from their data leak sites when a ransom is paid, there is no guarantee that the data will be deleted.[49] That data is valuable and can easily be sold to another threat actor, so there is little incentive to delete it.[50]

93.     Through its inadequate security practices, Defendants exposed Plaintiffs' and the Class's PII for sale and circulation on the dark web.

94.     Despite their duties and alleged commitments to safeguard PII, Defendants did not in fact follow industry standard practices in securing Plaintiffs' and the Class's PII, as evidenced by the Data Breach.

95.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

---

[49] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[50] *Id.*

96.     On information and belief, Defendants failed to adequately train and supervise their IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing them to lose control over Plaintiffs' and the Class's PII. Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

**Plaintiffs' Experiences and Injuries**

*Plaintiff Christopher Andrew Daly III*

97.     Plaintiff Christopher Andrew Daly III is a former employee of Defendant CSC, having worked for CSC from on or around 2018 to on or around 2021.

98.     Thus, Defendants obtained and maintained Plaintiff Daly's PII.

99.     As a result, Plaintiff Daly was injured by Defendants' Data Breach.

100.    Plaintiff Daly is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

101.    As a condition of his employment with CSC, Defendants obtained Plaintiff Daly's PII. Defendant CSC used that PII to facilitate its employment of Plaintiff Daly, including payroll, and required Plaintiff Daly to provide that PII in order to obtain employment and payment for that employment. Defendants used Plaintiff Daly's PII to facilitate their business operations and profited from its use of Plaintiff Daly's PII.

102.    Plaintiff Daly provided his PII to Defendants and trusted the companies would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continued to maintain Plaintiff Daly's PII and have continuing legal duties and obligations to protect that PII from unauthorized access and disclosure.

103.    Plaintiff Daly reasonably understood that a portion of the funds paid to Defendants (and/or derived from his employment) would be used to pay for adequate cybersecurity and protection of PII.

104.    On information and belief, Plaintiff Daly's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

105.    Plaintiff Daly has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

106.    And in the aftermath of the Data Breach, Plaintiff Daly suffered from a spike in spam, scam and phishing text messages and phone calls. The unwanted communications Plaintiff Daly is receiving are a distraction, must be blocked, and waste Plaintiff Daly's time each day.

107.    Once an individual's PII is for sale and access on the dark web, as Plaintiff Daly's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the scam, spam and phishing communications Plaintiff Daly is experiencing are a result of the Data Breach.

108.    Plaintiff Daly fears for his personal financial security and worries about what information was exposed in the Data Breach.

109.    Because of Defendants' Data Breach, Plaintiff Daly has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Daly's injuries are precisely the type of injuries that the law contemplates and addresses.

110.    Plaintiff Daly suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

111. Plaintiff Daly suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

112. Plaintiff Daly suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff Daly's PII right in the hands of criminals.

113. Because of the Data Breach, Plaintiff Daly anticipates spending considerable amounts of time and money to try and mitigate his injuries.

114. Today, Plaintiff Daly has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

*Plaintiff Matthew Benjamin Ross*

115. Plaintiff Matthew Benjamin Ross is an alumnus of Dartmouth, having attended Dartmouth from on or around 2011 to on or around 2015.

116. Thus, Defendants obtained and maintained Plaintiff Ross's PII.

117. As a result, Plaintiff Ross was injured by Defendants' Data Breach.

118. Plaintiff Ross is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

119. As a condition of being a student at Dartmouth, Dartmouth obtained Plaintiff Ross's PII. Dartmouth used that PII to provide educational services to Plaintiff Ross, including collecting tuition payments, and required Plaintiff Ross to provide that PII in order to be enrolled as a student

at Dartmouth. Defendant Oracle used Plaintiff Ross's PII to facilitate its business operations and profited from its use of Plaintiff Ross's PII.

120.    Plaintiff Ross provided his PII to Defendants and trusted that Defendants would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continued to maintain Plaintiff Ross's PII and have continuing legal duties and obligations to protect that PII from unauthorized access and disclosure.

121.    Plaintiff Ross reasonably understood that a portion of the funds paid to Defendants (and/or derived from his tuition payments to Dartmouth) would be used to pay for adequate cybersecurity and protection of PII.

122.    On information and belief, Plaintiff Ross's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

123.    Plaintiff Ross has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff Ross to take those steps in its breach notice.

124.    And in the aftermath of the Data Breach, Plaintiff Ross suffered from a spike in spam, scam and phishing text messages and phone calls. The unwanted communications Plaintiff Ross is receiving are a distraction, must be blocked, and waste Plaintiff Ross's time each day.

125.    Once an individual's PII is for sale and access on the dark web, as Plaintiff Ross's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the scam, spam and phishing communications Plaintiff Ross is experiencing are a result of the Data Breach.

126.    Plaintiff Ross fears for his personal financial security and worries about what information was exposed in the Data Breach.

127.    Because of Defendants' Data Breach, Plaintiff Ross has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Ross's injuries are precisely the type of injuries that the law contemplates and addresses.

128.    Plaintiff Ross suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

129.    Plaintiff Ross suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

130.    Plaintiff Ross suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff Ross's PII right in the hands of criminals.

131.    Because of the Data Breach, Plaintiff Ross anticipates spending considerable amounts of time and money to try and mitigate his injuries.

132.    Today, Plaintiff Ross has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

*Plaintiff Curtis Smith*

133.    Plaintiff Curtis Smith is a former employee of MasTec, having worked for Mastec from on or around 2010 to on or around 2023.

134.    Thus, Defendants obtained and maintained Plaintiff Smith's PII.

135.    As a result, Plaintiff Smith was injured by Defendants' Data Breach.

136.    Plaintiff Smith is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

137.    As a condition of his employment with Mastec, Defendants obtained Plaintiff Smith's PII. Defendant Mastec used that PII to facilitate its employment of Plaintiff Smith, including payroll, and required Plaintiff Smith to provide that PII in order to obtain employment and payment for that employment. Defendant Oracle used Plaintiff Smith's PII to facilitate its business operations and profited from its use of Plaintiff Smith's PII.

138.    Plaintiff Smith provided his PII to Defendants and trusted the companies would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continued to maintain Plaintiff Smith's PII and have continuing legal duties and obligations to protect that PII from unauthorized access and disclosure.

139.    Plaintiff Smith reasonably understood that a portion of the funds paid to Defendants (and/or derived from his employment) would be used to pay for adequate cybersecurity and protection of PII.

140.    On information and belief, Plaintiff Smith's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

141.    Plaintiff Smith has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

142.    And in the aftermath of the Data Breach, Plaintiff Smith suffered from a spike in spam, scam and phishing text messages and phone calls. The unwanted communications Plaintiff Smith is receiving are a distraction, must be blocked, and waste Plaintiff Smith's time each day.

143.    Once an individual's PII is for sale and access on the dark web, as Plaintiff Smith's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the scam, spam and phishing communications Plaintiff Smith is experiencing are a result of the Data Breach.

144.    Plaintiff Smith fears for his personal financial security and worries about what information was exposed in the Data Breach.

145.    Because of Defendants' Data Breach, Plaintiff Smith has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Smith's injuries are precisely the type of injuries that the law contemplates and addresses.

146.    Plaintiff Smith suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

147.    Plaintiff Smith suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

148.    Plaintiff Smith suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff Smith's PII right in the hands of criminals.

149.    Because of the Data Breach, Plaintiff Smith anticipates spending considerable amounts of time and money to try and mitigate his injuries.

150.    Today, Plaintiff Smith has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

*Plaintiff Emma Donald*

151.    Plaintiff Emma Donald is a former employee of MasTec, having worked for Mastec from on or around 2019 to on or around 2022.

152.    Thus, Defendants obtained and maintained Plaintiff Donald's PII.

153.    As a result, Plaintiff Donald was injured by Defendants' Data Breach.

154.    Plaintiff Donald is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

155.    As a condition of his employment with Mastec, Defendants obtained Plaintiff Donald's PII. Defendant Mastec used that PII to facilitate its employment of Plaintiff Donald, including payroll, and required Plaintiff Donald to provide that PII in order to obtain employment and payment for that employment. Defendant Oracle used Plaintiff Donald's PII to facilitate its business operations and profited from its use of Plaintiff Donald's PII.

156.    Plaintiff Donald provided her PII to Defendants and trusted the companies would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continued to maintain Plaintiff Donald's PII and have continuing legal duties and obligations to protect that PII from unauthorized access and disclosure.

157.    Plaintiff Donald reasonably understood that a portion of the funds paid to Defendants (and/or derived from her employment) would be used to pay for adequate cybersecurity and protection of PII.

158.    On information and belief, Plaintiff Donald's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

159.     Plaintiff Donald has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

160.     And in the aftermath of the Data Breach, Plaintiff Donald suffered from a spike in spam, scam and phishing text messages and phone calls. The unwanted communications Plaintiff Donald is receiving are a distraction, must be blocked, and waste Plaintiff Donald's time each day.

161.     Once an individual's PII is for sale and access on the dark web, as Plaintiff Donald's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the scam, spam and phishing communications Plaintiff Donald is experiencing are a result of the Data Breach.

162.     Plaintiff Donald fears for her personal financial security and worries about what information was exposed in the Data Breach.

163.     Because of Defendants' Data Breach, Plaintiff Donald has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Donald's injuries are precisely the type of injuries that the law contemplates and addresses.

164.     Plaintiff Donald suffered actual injury from the exposure and theft of her PII— which violates her rights to privacy.

165.     Plaintiff Donald suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

166.     Plaintiff Donald suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff Donald's PII right in the hands of criminals.

167.    Because of the Data Breach, Plaintiff Donald anticipates spending considerable amounts of time and money to try and mitigate her injuries.

168.    Today, Plaintiff Donald has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

169.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[51] Therein, Cisco reported the following:

    a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[52]

    b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[53]

    c.    89% of consumers stated that "I care about data privacy."[54]

    d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[55]

---

[51] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Dec. 10, 2025).

[52] *Id.* at 3.

[53] *Id.*

[54] *Id.* at 9.

[55] *Id.*

e.      51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[56]

f.      75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[57]

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

170.    Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.      loss of the opportunity to control how their PII is used;

b.      diminution in value of their PII;

c.      compromise and continuing publication of their PII;

d.      out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.      lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.      delay in receipt of tax refund monies;

g.      unauthorized use of their stolen PII; and

---

[56] *Id*.

[57] *Id*. at 11.

h.      continued risk to their PII—which remains in Defendants' possession—and
is thus as risk for futures breaches so long as Defendants fails to take
appropriate measures to protect the PII.

171.    Stolen PII is one of the most valuable commodities on the criminal information
black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to
$1,000.00 depending on the type of information obtained.

172.    The value of Plaintiffs and Class's PII on the black market is considerable. Stolen
PII trades on the black market for years. And criminals frequently post and sell stolen information
openly and directly on the "Dark Web"—further exposing the information.

173.    It can take victims years to discover such identity theft and fraud. This gives
criminals plenty of time to sell the PII far and wide.

174.    One way that criminals profit from stolen PII is by creating comprehensive dossiers
on individuals called "Fullz" packages. These dossiers are both shockingly accurate and
comprehensive. Criminals create them by cross-referencing and combining two sources of data—
first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone
numbers, emails, addresses, etc.).

175.    The development of "Fullz" packages means that the PII exposed in the Data
Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

176.    In other words, even if certain information such as emails, phone numbers, or credit
card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach,
criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators
and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is
happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this

Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

177.    Defendants disclosed the PII of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

178.    Defendants' failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

179.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

180.    In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[58]

181.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack.[59]

---

[58] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[59] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

182.    Further, as set forth *supra*, because CLOP carried out a substantially similar cyberattack in 2023, sophisticated entities such Defendants should have been aware of and had mitigation efforts in place to prevent a "zero-day vulnerability" attack as occurred in the Data Breach.

183.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

**Defendants Failed to Follow FTC Guidelines**

184.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that data collectors and subprocessors—like Defendants— should use to protect against unlawful data exposure.

185.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[60]  The FTC declared that, *inter alia*, businesses must:

    a.    protect the personal customer information that they keep;

    b.    properly dispose of personal information that is no longer needed;

    c.    encrypt information stored on computer networks;

    d.    understand their network's vulnerabilities; and

    e.    implement policies to correct security problems.

186.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[60] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

187.    Furthermore, the FTC explains that companies must:

a.    not maintain information longer than is needed to authorize a transaction;

b.    limit access to sensitive data;

c.    require complex passwords to be used on networks;

d.    use industry-tested methods for security;

e.    monitor for suspicious activity on the network; and

f.    verify that third-party service providers use reasonable security measures.

188.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

189.    In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

190.    Several best practices have been identified that—at a *minimum*—should be implemented by organizations such as Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

191.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

192.    Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

193.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

194.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in Defendants' Data Breach, including all those individuals who received notice of the breach.

195.    Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any of Defendants' officers

or directors, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

196.    Plaintiffs reserve the right to amend the class definition.

197.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

198.    Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control.

199.    Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 44,000 members.

200.    Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same unreasonable manner of notifying individuals about the Data Breach.

201.    Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

202.    Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common facts and legal questions—which predominate over any questions affecting individual Class Members, which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a.  if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b.  if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  if Defendants were negligent in maintaining, protecting, and securing PII;

d.  if Defendants breached contract promises to safeguard Plaintiffs and the Class's PII;

e.  if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.  if Defendants' Breach Notice was reasonable;

g.  if the Data Breach caused Plaintiffs and the Class injuries;

h.  what the proper damages measure is; and

i.  if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

203.  Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device

provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

### FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

204.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

205.    Plaintiffs and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

206.    Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

207.    Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

208.    Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiffs and Class Members' PII.

209.    Defendants owed—to Plaintiffs and Class Members—at least the following duties to:

> a.    exercise reasonable care in handling and using the PII in its care and custody;

b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access;

d.    notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

210.    Thus, Defendants owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

211.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

212.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

213.    Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendant.

214.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that

unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

215.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

216.    Defendants improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

217.    Defendants breached these duties as evidenced by the Data Breach.

218.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

    a.    disclosing and providing access to this information to third parties and

    b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

219.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

220.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

221.    Defendants have admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

222.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

223.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

224.    Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
**(On Behalf of Plaintiffs and the Class)**

225.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

226.    Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

227.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive PII.

228.    Defendants breached their respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

229.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

230.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

231.    But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class Members would not have been injured.

232.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

233.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

234.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

235.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

236.    Plaintiffs and Class Members either directly contracted with Defendants or Plaintiffs and Class Members were the third-party beneficiaries of contracts with Defendant.

237.    Plaintiffs and Class Members (or their third-party agents) were required to provide their PII to Defendants as a condition of receiving employment or educational services from Defendants. Plaintiffs and Class Members (or their third-party agents) provided their PII to Defendants or their third-party agents in exchange for Defendants' employment or in exchange for educational services.

238.    The contracts entered into by Plaintiffs' and Class Members' agents (for example, their employers), were made for the direct benefit of Plaintiffs and the Class.

239.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that a portion of the funds derived from their labor or their payments would be used to pay for adequate cybersecurity measures.

240.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

241.    Plaintiffs and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for employment or services.

242.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

243.    In their Privacy Policies, Defendants represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

244.    Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

245.    After all, Plaintiffs and Class Members (or their third-party agents) would not have entrusted their PII to Defendants (or their third-party agents) in the absence of such an agreement with Defendants.

246.    Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendants.

247.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

248.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

249.    Defendants materially breached the contracts they entered with Plaintiffs and Class Members (or their third-party agents) by:

      a.      failing to safeguard their information;

      b.      failing to notify them promptly of the intrusion into its computer systems that compromised such information.

      c.      failing to comply with industry standards;

      d.      failing to comply with the legal obligations necessarily incorporated into the agreements; and

      e.      failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

250.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

251.    Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

252.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

253.    Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

254.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

255.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

256.    Defendants owed a duty to their current and former employees or students, including Plaintiffs and the Class, to keep their PII confidential.

257.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

258.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

259.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

260.    Defendants acted with a knowing state of mind when they permitted the Data Breach because it knew their information security practices were inadequate.

261.    Defendants acted with a knowing state of mind when they failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

262.    Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

263.    As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and rediscosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

264.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the dark web.

265.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

266.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiffs and the Class.

267.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

268.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

269.    This claim is pleaded in the alternative to the breach of implied contract claim.

270.    Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon Defendants. After all, Defendants benefitted from (1) using their PII to facilitate employment and/or their operations, and/or (2) using their PII to derive profit.

271.    Defendants appreciated or had knowledge of the benefits they received from Plaintiffs and Class Members.

272.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

273.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

274.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

275.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) employment and/or (3) payments because Defendants failed to adequately protect their PII.

276.    Plaintiffs and Class Members have no adequate remedy at law.

277.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

278.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

279.    Given the relationship between Defendants and Plaintiffs and Class Members, where Defendants became guardians of Plaintiffs' and Class Members' PII, Defendants became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' PII; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

280.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

281.    Because of the highly sensitive nature of the PII, Plaintiffs and Class Members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

282.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

283.    Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

284.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.    Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.  Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.  Granting other relief that this Court finds appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Date: December 11, 2025                    Respectfully submitted,

By: */s/ Raina C. Borrelli*
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorney for Plaintiffs and Proposed Class*